UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY R. MARKS, | ) | Case No. 1:16-cv-02848 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | REPORT AND RECOMMENDATION |

Plaintiff Kimberly R. Marks[1] challenges the final decision of Defendant Commissioner of

Social Security ("Commissioner"), denying her application for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*

("Act").  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation.

The issue before the court is whether the final decision of the Commissioner is supported

by substantial evidence and, therefore, conclusive.  For the reasons set forth below, the

Magistrate Judge recommends that the Commissioner's final decision be affirmed.

---

[1]  Marks has also used the name Kimberly LaCroix.  (R. 7, PageID #: 188, 221.)  She is referred
to herein as Marks, Plaintiff or claimant.

1

## I.  PROCEDURAL HISTORY

On August 5, 2013, Marks filed an application for SSI benefits, alleging disability beginning May 28, 2013.  (R.7, PageID #: 54, 188-191, 221-233.)  Marks's application was denied initially and upon reconsideration.  (R.7, PageID #: 54, 113-128, 129, 130-142, 143.)  Thereafter, Marks filed a request for a hearing before an administrative law judge ("ALJ").  (R.7, PageID #: 159-160.)  The ALJ held a hearing on October 30, 2015.  (R.7, PageID #: 69-112.)  Marks appeared at the hearing, was represented by counsel, and testified.  (*Id.* at 71-72, 76-103.)  A vocational expert ("VE") also attended the hearing and provided testimony.  (*Id.* at 72, 104-111.)  On January 28, 2016, the ALJ issued the decision, applying the standard five-step sequential analysis to determine whether Marks was disabled.  (R.7, PageID #: 51-63; *see generally* 20 C.F.R. § 416.920(a).)  The ALJ concluded Marks was not disabled.  (R.7, PageID #: 54, 63.)  The Appeals Council denied Marks's request for review, thus rendering the ALJ's decision the final decision of the Commissioner.  (R.7, PageID #: 43-45.)

Marks now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  The parties have completed briefing in this case.  Marks presents the following legal issues for the court's review: (1) the ALJ erred when weighing the medical opinion evidence and (2) the ALJ erred when evaluating Marks's credibility.  (R. 8, PageID #: 1017.)

## II.  PERSONAL BACKGROUND INFORMATION

Marks was born on December 4, 1973, and was 39 years old, which is defined a younger individual age 18-49, on the application date.  (R.7, PageID #: 62, 188, 207.)  She has a college education, and is able to communicate in English.  (R.7, PageID #: 62, 221, 223.)  Marks had past work as a bookkeeper, and in counter sales (R.7, PageID #: 104-105.)

III.  RELEVANT MEDICAL EVIDENCE[2]

Disputed issues will be discussed as they arise in Marks's brief alleging error by the ALJ. As noted earlier, Marks applied for SSI on August 5, 2013.  (R.7, PageID #: 54, 188-191.) Marks listed her physical or mental conditions that limit her ability to work as:  "fibromyalgia, anxiety, migraines, insomnia, tremors, chronic fatigue, neuropathy, temporomandibular joint disorder (TMJ), autoimmune system problems."  (R.7, PageID #: 222.)

On May 2, 2013, Marks was seen by Nicholas J. Ksenich, M.D., following up from an E.R. visit for a fall several days earlier.  (R. 7, PageID #: 594, *see also* PageID #: 605 (fall at home, sprained knee).)  Marks complained of hip, back and knee pain.  *Id.*  She also reported weakness in her arms and legs, pain in her thighs, and insomnia.  *Id.*  Dr. Ksenich's assessment noted migraine headache, neuropathy, left arm pain, chronic pain, TMJ (dislocation of temporomandibular joint), insomnia, anxiety, and right knee pain.  *Id.* at 596.

On May 13, 2013, Marks presented to Heather Scullin, D.O., for an evaluation of anxiety. (R. 7, PageID #: 597-598.)  Dr. Scullin reported that Marks had the following anxiety symptoms: "chest pain, difficulty concentrating, dizziness, fatigue, feelings of losing control, insomnia, irritable, palpitations, paresthesias, psychomotor agitation, [and] racing thoughts."  *Id.* at 598. Marks reported chronic back pain for more than a year and moderate pain in the lumbar spine and thoracic spine, which radiates from her thighs into her groin.  *Id.*  Dr. Scullin reported that Marks's vital signs were normal, that she did not appear ill, or have a "sickly appearance," and

---

[2]  The summary of relevant medical evidence is not intended to be exhaustive.  It includes only those portions of the record cited by the parties and also deemed relevant by the court to the assignments of error raised.

that Marks was in no distress.  *Id.* at 601.  On examination, Marks's neck was supple, with a normal range of motion.  *Id.* Marks exhibited some decreased range of motion in her left shoulder, with tenderness there, and in both knees.  *Id.* at 602.  She also exhibited a decreased range of motion, tenderness and pain, in her cervical back and lumbar back.  *Id.*  Her arms, wrists, elbows, hands, hips, legs, and ankles were normal.  *Id.* at 602-603.

Dr. Scullin assessed Marks with acute low back pain, radiating to both legs, and noted that x-ray of the lumbar spine was negative.  (R. 7, PageID #: 604.)  She also assessed left shoulder pain, leg pain, right knee pain, and chronic pain of her whole body, but the doctor noted that all x-rays were normal.  *Id.*  Dr. Scullin identified a high risk of medication use, anxiety, migraine headaches, and active neuropathy of her hand.  *Id.*  Marks reported that she had been diagnosed with fibromyalgia, but the record notes that Marks suspected multiple sclerosis because of numbness.  *Id.*

On May 13, 2013, Dr. Scullin reviewed stretching and relaxation techniques, and recommended that Marks quit smoking, and exercise three times per week, for thirty minutes at a time.  (R. 7, PageID #: 606.)  Dr. Scullin also reviewed Marks's medications.  *Id.* at 605-606.

Marks presented to Dr. Ksenich for a follow-up visit on June 25, 2013, complaining of migraines and pain in many areas.  (R. 7, PageID #: 607.)  Dr. Ksenich referred her for a pain management evaluation with rheumatology.  *Id.* at 610-611.  Marks had a follow-up visits with Dr. Ksenich on July 26, 2013 and August 20, 2013, at which she complained of insomnia, temporomandibular joint pain, and migraines.  *Id.* at 611, 615.  Her medications were discussed, and Marks requested a doctor's excuse for additional time off work.  *Id.* at 611.  She had multiple tender spots, and at the August exam, Savella was prescribed (for fibromyalgia).  *Id.* at

4

618-619.  In August, Dr. Ksenich again advised Marks to keep the appointment for pain management evaluation and a specialist evaluation.  *Id.* at 615, 619.

Marks returned to Dr. Scullin on December 5, 2013, complaining of shoulder pain, worse in the left shoulder, worsening knee pain, and right hip pain.  (R. 7, PageID #: 642; 824.)  Dr. Scullin reported that Marks's vital signs were normal, that she did not appear ill, or have a sickly appearance, and that she was in no distress, although she appeared anxious.  *Id.* at 644.  On examination, her neck was supple, with a normal range of motion.  *Id.*  Marks exhibited tenderness in both shoulders and in both knees.  *Id.* at 645.  She also exhibited a decreased range of motion in her left elbow.  *Id.*  Marks exhibited a decreased range of motion in her lumbar back, and tenderness there as well as in her cervical back and thoracic back.  *Id.*  She had some decreased sensation in her hands.  *Id.* at 646.  Her arms, wrists, hips, legs, feet, and ankles were normal.  *Id.* at 645-646.

Dr. Scullin assessed Marks with active TMJ (temporomandibular joint disorder), chronic pain, left arm pain, migraine headaches, neuropathy, and active back, neck, shoulder and knee pain.  (R. 7, PageID #: 647.)  Dr. Scullin also noted anxiety, vitamin D deficiency and active fibromyalgia muscle pain.  *Id.*  Dr. Scullin again reviewed stretching and relaxation techniques, and repeated her recommendation that Marks quit smoking, and exercise three times per week, for thirty minutes at a time.  *Id.* at 650.  The treatment plan included follow-up with her primary care physician, and, after OT, to discuss medicine and injection options.  *Id.*

Marks returned to Dr. Ksenich and Estacia Cooper, N.P., on January 30, 2014, for an annual exam.  (R. 7, PageID #: 826-827.)  Marks reported no complaints to NP Cooper that day.  *Id.* at 826.  Marks denied regular exercise, and reported smoking.  *Id.*  To Dr. Ksenich, however, Marks reported back pain in the mid- to low spine, which was worse with activity, and better

5

with lying down.  *Id.* at 827.  Marks reported less migraines, but no improvement from fibromyalgia medications.  *Id.*

Dr. Ksenich noted she was "alert, well appearing and in no distress," and she had multiple tender spots.  (R. 7, PageID #: 830.)  The doctor referred Marks to neurosurgery for chronic pain, neuropathy, tremors of the nervous system, and back pain.  *Id.* at 830-831.  Dr. Ksenich's assessment also noted insomnia, TMJ, left arm pain, migraines, anxiety, and vitamin D deficiency.  *Id.*

On January 29, 2015, Marks presented to Bharat Shah, M.D., of the Comprehensive Pain Center, for evaluation of joint and muscle pain, on referral from Dr. Ksenich.  (R. 7, PageID #: 873-877.)  Marks reported to Dr. Shah that she had been in a car accident in 2001.  *Id.* at 873. She reported problems with pain since 2012, which included symptoms in her neck, back, and almost all the joints of her body.  *Id.*  Marks specifically reported "arthritis, back pain, joint pain, joint stiffness, joint swelling, limitations in ROM, muscle cramps, muscle pain, muscle weakness, neck pain, pain between the shoulders, difficulty walking and leg pain."  *Id.* at 875. Dr. Shah noted that Marks appeared in no acute distress, with mild pain.  *Id.*

Upon examination, Dr. Shah noted that head and neck flexion and rotation were painful. (R. 7, PageID #: 876.)  There was diffuse tenderness over the cervical spine, and multiple tender points over both trapezius muscles and the upper part of the cervical spine.  *Id.*  There was diffuse tenderness in the spine, with no reduction of range of movement.  *Id.*  Straight leg raising was painful bilaterally.  *Id.* Range of motion was normal for both knees and both hips.  *Id.* Strength, sensation, and reflexes of the arms and legs were within normal limits.  *Id.*  All muscle testing was also within normal limits.  *Id.*

6

Dr. Shah diagnosed Marks with cervicalgia, lumbago, and rheumatoid arthritis.  (R. 7, PageID #: 877.)  The doctor adjusted her medications, discontinuing the narcotic Narco, and several other drugs, but continuing her Klonopin and Elavil, and starting Savella.  *Id.*  Dr. Shah also ordered an x-ray of the lumbar spine.  *Id.*

At a March 3, 2015, follow-up appointment with Osma Malak, M.D., of the Comprehensive Pain Center, Marks reported that "she has been feeling significant improvement in the pain of her whole body."  (R. 7, PageID #: 877.)  However, Marks still complained of diffuse body pain, mainly in the neck, upper and lower back, and hips.  *Id.* at 880.  The treatment plan was to start an aquatherapy program.  *Id.* at 881.  At an April 1, 2015, appointment with Dr. Malak, Marks reported her fibromyalgia was continuing to be painful, and that her pain had actually worsened.  *Id.* at 881, 884.  Dr. Malak adjusted her medications.  *Id.* at 884.

In addition to the home exercise program advised by Dr. Scullin, above, treatment plans were recommended by Sameh R. Yonan, M.D., of the Comprehensive Pain Center, and rheumatologist Margaret Tsai, M.D., for decreasing Marks's pain in the cervical spine and lumbar spine.  (R. 7, PageID #: 890, 918, 940-941.)  On January 15, 2014, Dr. Tsai recommended that Marks exercise for thirty minutes, three times a week, suggesting "weight-bearing aerobic exercises such as walking, dancing, low impact aerobics, elliptical machine, stair climbing, gardening, flexibility exercises and strength training exercises."  (R. 7, PageID #: 940, *see also* 935, 941-942.)  On June 3, 2015, Dr. Yonan recommended that Marks "undergo stretching, strengthening, and resistance exercises for the back and abdominal muscles."  *Id.* at PageID #: 915, 918; *see also* 890 (same).  In addition, a home exercise program including "walking for 30 minutes twice daily followed by walking stairs for 10 minutes" was recommended.  *Id.* at PageID #: 918.

The parties have also identified the below medical opinions.  State agency reviewing physician, Maureen Gallagher, D.O., completed a Physical Residual Functional Capacity ("RFC") Assessment on October 24, 2013.  (R. 7, PageID #: 124-126.)  Dr. Gallagher stated that Marks had exertional limitations due to fibromyalgia, but assessed she could lift or carry up to twenty pounds occasionally, and ten pounds frequently.  *Id.* at 124-125.  Marks could stand or walk for about six hours of an 8-hour workday, and sit for six hours.  *Id.* at 125.  Concerning postural limitations, the doctor opined that Marks could climb ramps or stairs occasionally; could frequently balance, stoop, kneel, crouch, or crawl; and could never climb ladders, ropes or scaffolds.  *Id.* Dr. Gallagher further opined that Marks should avoid all exposure to hazardous machinery and heights.  *Id.* at 126.  Dr. Gallagher noted that claimant reported ongoing pain throughout her joints, but that her x-rays and exams have been normal.  *Id.*

On reconsideration, Diane Manos, M.D., completed a Physical RFC Assessment on June 7, 2014.  (R. 7, PageID #: 138-139.)  Dr. Manos assessed the identical limitations as had Dr. Gallagher.  *Id.* Dr. Manos indicated "no worsening alleged on reconsideration" and review of the medical evidence of record does not support any material functional changes.  *Id.* at 139.

Dr. Ksenich completed a form entitled "Multiple Impairment Questionnaire" ("questionnaire") on July 1, 2014, indicating he began treating Marks in November 2012.  (R. 7, PageID #: 892-899.)  Dr. Ksenich responded to the second question in the questionnaire, "What is your diagnosis of your patient's condition?" by simply stating "See note."  *Id.* It is unclear what "note" the doctor is referring to, because there is no note attached to the questionnaire, as submitted in the record.  *See generally* R. 7, PageID #: 892-899.  The doctor's entire description of the claimant's prognosis is "guarded."  *Id.* at 892.  Moreover, the doctor responded "see note" to the next three questions:

8

    4.  Identify the positive clinical findings that demonstrate and/or support your diagnosis and indicate location where applicable.

    5.  Identify the laboratory and diagnostic test results which demonstrate and/or support your diagnosis.

    6.  Please list your patient's primary symptoms, including pain, loss of sensation, fatigue, etc.

(R. 7, PageID #: 892-893.)  The next question was, "Are your patient's symptoms and functional limitations reasonably consistent with the patient's physical and/or emotional impairments described in this evaluation?"  *Id.* at 893.  Despite the doctor not listing any symptoms where requested on the form, the box for "yes" was checked.  *Id.*  In sum, the doctor provided no symptoms or diagnosis on the questionnaire, nor did he provide any clinical findings, or any laboratory or diagnostic test results.

    The doctor indicated that Marks had daily pain in both legs, arms, and hands, which was precipitated by "heat" and "activity," but did not address the nature of the pain and simply wrote "see note."  (R. 7, PageID #: 893-894.)  He circled or checked that Marks suffered from severe pain (10/10) and severe fatigue (9/10); her medication did not completely relieve the pain without unacceptable side effects; and Marks's RFC would be limited to sitting "0-1" hours, and standing or walking "0-1" hours in an eight-hour workday.  *Id.* at 894.  The doctor opined she would need to get up and move around every fifteen minutes, for 15 minutes, *id.* at 894-895, and recommended that the claimant not stand or walk continuously in a work setting.  *Id.* at 895.  Dr. Ksenich indicated that Marks could occasionally lift or carry up to ten pounds, with moderate limitations in grasping, turning, or twisting objects; using her fingers or hands for fine manipulation; and using her arms for reaching (including overhead).  *Id.* at 895-896.

    Where the form requested a list of medications prescribed, dosage, and any reported side effects, the doctor wrote, "see list."  *Id.* at 896.  It is unclear what "list" the doctor is referring to,

because there is no list attached to the questionnaire, as submitted in the record.  *See generally* R. 7, PageID #: 892-899.  The doctor checked off that he had "substituted medications in an attempt to produce less symptomatology or relieve side effects."  *Id.* at 896.  However, as noted, the form did not include a list of current medications prescribed for the claimant.

The doctor indicated that Marks's (unidentified) symptoms would likely increase if she were placed in a competitive work environment (R. 7, PageID #: 896, *see also* PageID #: 893) and that her pain, fatigue and other symptoms were severe enough to interfere with her attention and concentration.  *Id.* at 897.  Stress aggravates her symptoms, but Dr. Ksenich indicated that claimant was capable of a low level of work stress.  *Id.*

Dr. Ksenich noted that Marks would sometimes need to take unscheduled rest breaks, four to six times per workday, resting (on average) thirty to sixty minutes before returning to work.  *Id.*  In other words, Marks would need rest periods ranging from two hours to six hours total, per workday.  The doctor also estimated that Marks would be absent, on average, more than three times per month as a result of her impairments.  *Id.* at 898.  She would need a job that permits ready access to a restroom, and additional limitations include psychological limitations, the need to avoid fumes, gases, temperature extremes, and humidity.  *Id.*  In addition, Marks was limited to no kneeling, bending, or stooping.  *Id.*

There are no other treating physician opinions at issue in this case.

## IV.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in the January 28, 2016, decision:

1.  The claimant has not engaged in substantial gainful activity since August 5, 2013, the application date (20 CFR 416.971 *et seq.*).

10

2.  The claimant has the following severe impairment: fibromyalgia (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.  After careful consideration of the entire record, the undersigned  finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can never climb ladders or scaffolds, but may occasionally climb ramps and stairs.  She can frequently balance, stoop, kneel, crouch, and crawl.  The claimant must avoid all exposure to unprotected heights, moving mechanical parts, and operation of a motor vehicle.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on December 4, 1973, and was 39 years old, which is defined a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.964).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since August 5, 2013, the date the application was filed (20 CFR 416.920(g)).

(R.7, PageID #: 56, 59-60, 62-63.)

## V.  DISABILITY STANDARD

A claimant is entitled to receive SSI benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered

disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  20 C.F.R. § 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a disability determination.  *See* 20 C.F.R. § 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(i).  Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.  *Id.* § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  *Id.* § 404.1520(a)(4)(iii).  Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled.  *Id.* § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.  *Id.* § 404.1520(a)(4)(v).
>
> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20 C.F.R. § 416.920(a)(4).

## VI.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence.  *Blakley v. Commissioner of Social Security*, 581 F.3d 399,

405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence.  *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion.  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Commissioner*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

## VII.  ANALYSIS

Marks presents the following legal issues for the court's review: "1. The ALJ failed to properly weigh the medical opinion evidence" and "2.  The ALJ failed to properly evaluate Plaintiff's credibility" (R. 8, PageID #: 1017.)

13

A.  Treating Physician Rule

Marks asserts that the ALJ failed to properly weigh the medical opinion evidence, and specifically argues that the ALJ erred by giving "little weight" to the opinion of treating physician Dr. Ksenich.  (R. 8, PageID #: 1024-1027.)  Marks contends that the ALJ failed to support the conclusory finding that the doctor's opinion was contradicted by his treatment records.  *Id.* at 1025.  Marks further asserts that, even if the treating physician's opinion was not entitled to controlling weight, the opinion should be weighed using the factors in 20 C.F.R. § 416.927.  *Id.* at 1027.

It is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians.[3]  *Gayheart v. Commissioner*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544.  This doctrine, often referred to as the "treating physician rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are often well equipped to provide a complete picture of the individual's health and treatment history.  *Id.*; 20 C.F.R. § 416.927(c)(2).  The treating physician rule requires opinions from treating physicians to be given controlling weight where the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record."  *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544.  In other words,

---

[3]  Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017.  82 *Fed. Reg.* 5844-5884 (Jan. 18, 2017).  Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect.  For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision.

14

treating physicians' opinions are only given deference when supported by objective medical evidence. *Vance v. Commissioner*, 260 Fed.Appx. 801, 804-05 (6th Cir. 2008) (citing *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003)).

Social Security regulations require the ALJ to give good reasons for discounting evidence of disability submitted by the treating physician(s). *Blakley*, 581 F.3d at 406; *Vance*, 260 Fed.Appx. at 805. Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight assigned to the treating physician's opinion, and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Blakley*, 581 F.3d at 406-407; *Winning v. Commissioner*, 661 F.Supp.2d 807, 818-819 (N.D. Ohio 2009) (quoting SSR 96-2p). The obligation to provide good reasons permits meaningful and efficient review of the ALJ's application of the treating physician rule. *Cole*, 661 F.3d at 938. In some cases, even a "brief" statement identifying the relevant factors has been found adequate to articulate "good reasons" to discount a treating physician's opinion. *Allen v. Commissioner*, 561 F.3d 646, 651 (6th Cir. 2009). In addition, state agency doctors are considered highly-qualified experts in disability evaluation, and the ALJ must consider their evidence. 20 C.F.R. §§ 404.1513a(b)(1); 404.1527(e). Although the ALJ generally accords more weight to a treating source over those of a non-examining source, the ALJ is not prohibited from adopting the findings of a non-examining source. *See generally Ealy v. Comm'r Soc. Sec. Admin.*, 594 F.3d 504, 514-515 (6th Cir. 2010); *Smith*, 482 F.3d at 875.

Further, even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations. *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c). The following factors are to be balanced in determining the weight to assign: "the

length of the treatment relationship and the frequency of examination, the nature and extent of

the treatment relationship, supportability of the opinion, consistency of the opinion with the

record as a whole, and specialization of the treating source." *Cole v. Astrue*, 661 F.3d 931, 937

(6th Cir. 2011) (quoting *Wilson*, 378 F.3d at 544).  Marks contends the ALJ erred by not applying

the factors set forth in the regulations when discounting the treating physician's opinion.

Although the ALJ is directed to consider such factors, the ALJ is not required to provide an

"exhaustive factor-by-factor analysis" in the decision. *Francis v. Commissioner*, No. 09-6263,

2011 WL 915719, at *3 (6th Cir. March 16, 2011); accord *Nelson v. Comm'r of Soc. Sec.*, 2017

U.S. Dist. LEXIS 177445, *24, 2017 WL 4837581 (S.D. Ohio, Oct. 26, 2017); *Beaver v.

Comm'r of SSA*, 2017 U.S. Dist. LEXIS 189871 at *29 (N.D. Ohio, October 16, 2017) ("An ALJ

is not obliged to provide 'an exhaustive factor-by-factor analysis' of the factors considered when

weighing medical opinions.")  (Burke, M.J.)

> In this case, the ALJ's decision discussed the treating physician's opinion as follows:
>
> The undersigned accords little weight to the opinion of Dr. Nicholas Ksenich
> finding, among other things, that the claimant was only capable of performing less
> than sedentary exertion with the ability to sit, stand, and walk up [to] one-hour of
> an 8-hour workday.  (Exhibit 14F).  The undersigned finds that Dr. Ksenich's
> opinion is inconsistent with his own treatment records and lacks any meaningful
> explanation.  (*Id.*, *see also* Exhibit 12F).

(R. 7, PageID #: 62.)  Although the ALJ provided a brief statement explaining the reasons for

discounting the doctor's opinion, it is apparent that the ALJ was troubled that the opinion lacked

"supportability," which is one of the factors specifically set forth in the regulations to evaluate

opinion evidence.[4]  The regulations state that "[t]he more a medical source presents relevant

---

[4] In addition, the ALJ's decision highlighted the treating provider's records earlier in the
decision and, as explained below, reasonably determined they were inconsistent with the
questionnaire opinion.

16

evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 416.927(c)(3). The ALJ found Dr. Ksenich's opinion unsupported, because it "lacks any meaningful explanation." (R. 7, PageID #: 62.)

Numerous decisions have found that the use of checklist or check-the-box forms in which the doctor provides little or no accompanying explanation for the assessed limitations, such as that provided herein by Dr. Ksenich (R. 7, PageID #: 892-899), are unsupported and, therefore, the ALJ may properly discount the treating source opinions.[5] Although the ALJ did not directly cite the questionnaire's check-box format as a basis for rejecting it, the decision concluded the opinion lacked explanation. Recent decisions from the Sixth Circuit suggest that the check-box format for a treating source's opinion is relevant even when the ALJ did not specifically call attention to it in the decision. In *Ellars*, the Sixth Circuit agreed with "the district court that the

---

[5] *See, e.g., Kepke v. Commissioner*, No. 15-1315, 2016 WL 124140, at *4 (6th Cir. Jan. 12, 2016) (doctor's "checklist opinion did not provide an explanation for his findings; therefore, the ALJ properly discounted it"); *accord Langlois v. Colvin*, No. 3:15CV1682, 2016 WL 1752853, at *8 (N.D. Ohio May 3, 2016) (finding ALJ did not err by rejecting treating source's unexplained checklist opinion); *see also Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("We have held that the ALJ may 'permissibly reject . . . check-off reports that [do] not contain any explanation of the bases of their conclusions'") (citations omitted); *Smith v. Astrue*, No. 08-4634, 2009 WL 5126559, at *3 (3d Cir. Dec. 30, 2009) ("checklist forms . . . which require only that the completing physician 'check a box or fill in a blank,' rather than provide a substantive basis for the conclusions stated, are considered 'weak evidence at best' in the context of a disability analysis.") (citations omitted); *Hyson v. Commissioner*, No. 5:12CV1831, 2013 WL 2456378, at *14 (N.D. Ohio June 5, 2013) (finding that because doctor merely checked boxes on the form while leaving those sections of the form blank where she was to provide her written explanation, doctor failed to provide any substantive basis for stated conclusions and the ALJ was not required to accept the opinions); *cf. Price v. Commissioner*, No. 08-4210, 2009 WL 2514079, at *3 (6th Cir. Aug. 18, 2009) (because doctor failed to identify objective medical findings to support his opinion regarding claimant's impairments, ALJ did not err in discounting his opinion).

17

[ALJ] gave 'good reasons' for not affording Dr. Schall's opinion controlling weight." *Ellars v. Commissioner*, No. 15-4039, 2016 WL 2610234, at *3 (6th Cir. May 6, 2016).  The *Ellars* court explained further:

> Dr. Schall's evaluation consisted of a two-page form on which he entered check marks in the blanks regarding plaintiff's physical limitations…. Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's "check-off form" of functional limitations that "did not cite clinical test results, observations, or other objective findings...." …. These cases recognize that the administrative law judge properly gave a check-box form little weight where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence.  In the "REMARKS" section of the Physical Capacity Evaluation, Dr. Schall simply noted plaintiff's impairments consisted of severe peripheral vascular disease, coronary artery disease, COPD, depression and anxiety.  These remarks were not sufficient to explain Dr. Schall's findings.

*Id*. at *2 (internal citations omitted).  In *Ellars*—as in the case at bar—the ALJ's analysis of the treating source's opinion did not actually identify the check-box format of the opinion in question as a reason for discounting it.  *Ellars v. Commissioner*, No. 2:14CV2050, 2015 WL 3537442 at *3 (S.D. Ohio Jun. 4, 2015) (ALJ only observed that the medical opinion was "conclusory," and provided "very little explanation"), *adopted by* 2015 WL 4538392 (S.D. Ohio July 27, 2015), *aff'd*, 2016 WL 2610234 (6th Cir. May 6, 2016).  Nevertheless, the Sixth Circuit affirmed the district court, which had affirmed the ALJ's decision to reject a treating source's opinion.  *Ellars*, 2016 WL 2610234.  The district court's decision was rooted in the deficient check-box form, because it lacked sufficient explanation for the disputed opinion.

Another Sixth Circuit decision determined that a check-box opinion, unaccompanied by any explanation, was "'weak evidence at best' and meets our patently deficient standard." *Hernandez v. Commissioner*, No. 15-1875, 2016 WL 1055828, at *4 (6th Cir. Mar. 17, 2016)

(citing *Friend v. Commissioner*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr. 28, 2010)).[6]  The *Hernandez* decision explained that "[e]ven if the ALJ erred in failing to give good reasons for not abiding by the treating physician rule, it was harmless error" where the opinion in question was an unsupported check-box opinion.  *Id.*, at *6.  In addition, a doctor's "conclusory opinion, which provided no supporting findings or records and consisted largely of one word answers, circles, and check-marks" was deficient, in part, because as *Hernandez* indicates "[s]uch opinions have been characterized as 'weak evidence at best' that meets the 'patently deficient standard.'"  *Shepard v. Commissioner*, No. 17-1237, 2017 WL 4251707, at *4 (6th Cir. Sept. 26, 2017) .  Other courts have concluded the same, noting that "even if the ALJ failed to provide good reasons" for assigning little weight to a treating source's opinion, such error was harmless where the opinion consisted of a check-box worksheet lacking any explanation beyond a diagnosis.  *Toll v. Commissioner*, No. 1:16CV705, 2017 WL 1017821 at *4 (W.D. Mich. Mar. 16, 2017); *see also Denham v. Commissioner*, No. 2:15CV2425, 2016 WL 4500713, at *3 (S.D. Ohio Aug. 29, 2016) (magistrate judge "correctly found that any error in the ALJ's consideration of Lewis' evaluation was harmless because the check-box form was so patently deficient that the Commissioner could not possibly credit it," observing that "[t]he Sixth Circuit has cast doubt on the usefulness of check-box forms where the physician fails to give any explanation for his findings.")[7]

---

[6]  The *Friend* decision identified three instances where a violation of the treating physician rule would be harmless error.  *Friend*, 2010 WL 1725066, at *8.  The first instance, found applicable by the *Hernandez* court, was where "a treating source's opinion is so *patently deficient* that the Commissioner could not possibly credit it."  *Id.* (emphasis added).

[7] *See also Jackson v. Commissioner*, No. 1:16CV14404, 2017 WL 4699721 at *7 (E.D. Mich. Oct. 19, 2017) (finding medical source statement that was in "check-box format" was "an impotent addition to the record with little to no persuasive value," and it was "immaterial" if there was certain evidence in the record consistent with the opinion "because the ALJ provided

Dr. Ksenich's July 2014 opinion mirrors the unexplained and unsupported checklist/check-box opinions disfavored in the above-cited cases.  As set forth in the recitation of the medical evidence, *supra*, the the doctor responded to questions such as, "What is your diagnosis of your patient's condition," questions asking the doctor to identify the positive clinical findings that support his diagnosis, as well as to identify the laboratory and diagnostic test results which support the diagnosis, with the answer:  "See note."  (R. 7, PageID #: 892-893.)  No note was appended to the questionnaire.[8]  A question asking the doctor to "list your patient's primary symptoms, including pain, loss of sensation, fatigue, etc." received the same response.  *Id.* at 893.

---

'good reasons' for discounting his opinion and this Court may not reweigh the evidence"); *cf. Herzog v. Commissioner*, No. 2:16CV244, 2017 WL 4296310, at *3 (S.D. Ohio Sept. 28, 2017) (disagreeing with report and recommendation—which determined it was error for an ALJ to reject an opinion because it was given on a check-box, preprinted form—and noting that while "there is no per se rule regarding this type of evidence, the Sixth Circuit has cast doubt on the usefulness of check-box forms where the physician fails to give any explanation for his or her findings").

[8]  The record contains nearly three hundred pages of treatment records from Dr. Ksenich.  *See generally* R. 7, exhibits 6F, 10F, and 12F.  The burden lies with the claimant to prove that she is disabled by identifying sufficient evidence in support.  *See generally Ferguson v. Commissioner*, 628 F.3d 269, 275 (6th Cir. 2010); *Wilson*, 378 F.3d at 548; *Nabours v. Commissioner*, No. 01-6464, 2002 WL 31473794, at *3 (6th Cir. Nov. 4, 2002); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).  Plaintiff seeks to rely on the opinion of a treating physician, who had the opportunity on the questionnaire to identify such evidence, but did not.  *See, e.g.*, R. 7, PageID #: 892-893, 898.  Further, Marks's brief argues that the ALJ's decision "failed to provide any explanation for his conclusory finding that Dr. Ksenich's opinions are contradicted by the treatment records," and suggests the doctor's questionnaire specifically references the applicable records supporting his opinion.  (R. 8, PageID#: 1025, citing TR. 850-851).  That argument, however, does not identify any pertinent treating records, but simply cites to the pages of Dr. Ksenich's questionnaire where he indicated "see [unspecified] note."  Although reviewing courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, *Heston*, 245 F.3d at 535, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The doctor's threadbare opinion contains no diagnosis, let alone any meaningful explanation as to how the symptoms of Marks's medically determinable impairments would cause the listed restrictions.  Further, the opinion fails to cite any specific evidence (such as objective findings, observations, medical records) to support the limitations assessed.  (R. 7, PageID #: 892-899.)  Based on the *Hernandez* decision and the aforementioned case law, the Sixth Circuit has cast significant doubt on the usefulness of opinions that consist largely of one word answers, circles, and check-marks, while providing no supporting findings or reference to specific medical records because such opinions meet the patently deficient standard.  However, this court need not conclude that the ALJ's analysis of the treating physician's opinion was harmless error, because the ALJ's decision demonstrates good reasons for discounting the aforementioned opinion.

In addition to finding the opinion lacked support, the ALJ also concluded that Dr. Ksenich's opinion was inconsistent with his own treatment records, which the ALJ's decision summarized in the decision.  (R. 7, PageID #: 61 (discussing treatment records in Ex. 12F); 62.)  "Consistency" is a pertinent regulatory factor to consider when evaluating opinion evidence.  20 C.F.R. § 416.927(c)(4).  The ALJ pointed out that, despite Marks's complaints of pain, "radiology tests failed to reveal any abnormalities in her spine, left shoulder, left hip, right knee, right hand, or pelvis."  (R. 7, PageID #: 60-61, citing, *inter alia*, PageID #: 735-746 (cervical spine MRI ordered by Dr. Ksenich; x-rays of shoulder, knee, ribs, hip, pelvis, and lumbar spine).)  The ALJ also noted that, despite her alleged chronic pain, her treating physician noted that "claimant was well appearing and not in any distress."  (R. 7, PageID #: 61, citing PageID #: 817, 840.)  The ALJ noted that records indicated Marks maintained normal range of motion in her neck.  (R. 7, PageID #: 61, citing PageID #: 818-819, 860.)  Although medical evidence in

21

the record indicated that Marks "exhibited decreased range of motion in her left elbow and lumbar spine, examination of her right elbow, wrists, hips, ankles, arms and legs resulted in normal findings." (R.7, PageID #: 61, citing PageID #: 818-820, 860.) Moreover, the ALJ concluded that the medical evidence showed Marks "maintained normal muscle tone as well as strength and was without any atrophy, tremor, or cranial nerve or sensory deficits," and she maintained a normal gait and coordination. (R.7, PageID #: 61, citing PageID #: 821.) As the ALJ determined, these findings are inconsistent with Dr. Ksenich's opinion limiting Marks to less than sedentary exertion, with the ability to sit, stand, and walk up to one hour in a workday. (R.7, PageID #: 62.) This is particularly relevant when the doctor's opinion fails to cite any specific evidence to support the limitations assessed.

The court finds that claimant's first assignment of error is without merit, as the treating provider's questionnaire and check-box opinion lacked sufficient explanation, and the ALJ gave good reasons for not adopting the unsupported July 2014 opinion.

## B.  Credibility

Marks further argues that the ALJ failed to properly evaluate her credibility. (R. 8, PageID #: 1027-1030.) Marks contends that the ALJ's credibility determination "rests largely on a fundamental misunderstanding of fibromyalgia, which does not produce any findings on imaging studies or alarming clinical abnormalities on examination other than tender points as documented throughout the record here." *Id.* at 1029. The Commissioner responds that although fibromyalgia "is assessed largely based on a claimant's subjective complaints, its severity…must be determined from an evaluation all the evidence of record, including objective medical findings…." (R. 9-1, PageID# 1045). It further contends "the ALJ extensively considered the

22

objective medical evidence, medical opinions, treatment history, and evidence of daily activities in assessing Plaintiff's subjective complaints."  (R. 9-1, PageID# 1044, citing Tr. 18-20).

In this case, the ALJ specifically found that claimant suffered from fibromyalgia, and designated it as a "severe" impairment.  (R. 7, PageID# 56).  A finding that fibromyalgia constitutes a severe impairment, however, does not equate to a finding of disability, nor does a diagnosis of fibromyalgia corroborate the severity of a claimant's pain symptoms.  *Vance*, 260 Fed.App'x at 806 ("A diagnosis of fibromyalgia does not automatically entitle Vance to disability benefits; particularly so here, where there is substantial evidence to support the ALJ's determination that Vance's fibromyalgia was either improving, or, at worst, stable."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority."); *accord Foutty v. Comm'r of Soc. Sec.*, No. 5:10 CV 551, 2011 WL 2532915, at *7 (N.D. Ohio June 2, 2011) (Knepp, M.J.), *report and recommendation adopted*, 2011 WL 2532397 (N.D. Ohio June 24, 2011).

Social Security Ruling ("SSR") 12-2p sets forth the Social Security Administration's directions for evaluating fibromyalgia.  SSR 12-2p; 2012 WL 3104869 (July 25, 2012).  It also sets forth the manner to evaluate a person's statements about his or her symptoms and functional limitations (*i.e.* credibility).  *Id*.  Essentially, ALJs are instructed to use the same method in determining credibility as set forth in SSR 96-7p.  *Id*.  First, the ALJ must determine whether "medical signs and findings that show the person has an MDI(s) which could reasonably be expected to produce the pain or other symptoms alleged," recognizing that fibromyalgia "satisfies the first step of our two-step process for evaluating symptoms."  *Id*.  Second, and more pertinent to this case, SSR 12-2p specifically allows the ALJ to consider whether "objective

medical evidence … substantiate[s] the person's statements about the intensity, persistence, and functionally limiting effects of symptoms." *Id*.  If not, the ALJ is to consider "all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." *Id*.  Therefore, Plaintiff's assertion that the ALJ's credibility assessment was flawed, because it misunderstood fibromyalgia when considering the lack of objective evidence, is not well taken.

Moreover, Plaintiff has alleged symptoms of an extreme magnitude, stating that she could only stand/sit about fifteen to twenty minutes at a time and walk one-half block (R. 7, PageID# 60), giving rise to the inference that she must lay down a significant portion of the day.  While objective tests may not be useful in diagnosing fibromyalgia or corroborating the existence of its pain symptoms, this case presents a different set of facts.  Here, the ALJ did not question the diagnosis of fibromyalgia, nor did the ALJ question whether Plaintiff suffers from musculoskeletal pain as a result.  The ALJ's decision does not suggest he erroneously expected to see medical tests demonstrating the presence of fibromyalgia or expect the objective evidence to confirm the presence or severity of Plaintiff's alleged pain.  Rather, given the extremely restricted nature of Plaintiff's alleged activities and her stated inability to sit, stand, or walk for any significant length of time since at least her application in 2013, it was not unreasonable for the ALJ to expect that such inactivity would produce measurable deterioration in her muscle tone, strength, mobility, or other observable clinical signs.  As such, the ALJ's decision did not expect to see objective signs of fibromyalgia or its associated symptoms, but rather objective signs of Plaintiff's inactivity.

The ALJ's decision noted that "claimant asserted she had been unable to perform any work primarily because [of] persistent musculoskeletal pain."  (R. 7, PageID #: 60.)  Marks claimed she has "ongoing difficulty with her ability to sit, stand, walk, lift, and perform other postural activity, all of which allegedly limited her ability to complete normal activities of daily living."  *Id.*  The ALJ recognized that an individual's symptoms may suggest a greater level of impairment severity than what may be shown by the longitudinal medical record, thus the ALJ also considered other evidence in assessing the credibility of the claimant's statements regarding limitations.  *Id.*  The ALJ noted that 20 C.F.R. § 416.929(c) provides guidance on the kinds of evidence that may be considered, including claimant's daily activities, pain or other symptoms, aggravating factors, treatment regimens including medications, measures other than treatment that are used to help alleviate symptoms, as well as any other relevant factors.  *Id.*, citing SSR 96-7p.

Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must determine the claimant's credibility based on a consideration of the entire case record.  *Rogers v. Commissioner*, 486 F.3d 234, 247 (6th Cir. 2007).  The ALJ's assessment of the claimant's credibility must be supported by substantial evidence.  *Walters*, 127 F.3d at 531; *Gonzalez v. Commissioner*, No. 1:06CV687, 2008 WL 584927, at *5 (W.D. Mich. Jan. 17, 2008).  To the extent that the ALJ's findings are based on the credibility of the claimant, those findings are accorded great weight and deference.  *Id.*

The ALJ is not permitted to make credibility determinations based solely upon intangible or intuitive notions about an individual's credibility, but rather the ALJ's credibility determinations must be "based on a consideration of the entire case record," and "must find

25

support in the record." *Rogers*, 486 F.3d at 247-248.  SSR 96-7p also requires the ALJ's credibility determinations "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248.  The ALJ can also consider a number of factors that may or may not corroborate the claimant's allegations of pain, including:  statements from the claimant and the claimant's treating, examining, or consulting physicians; the claimant's daily activities; the location, duration, frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms. *See Felisky v. Bowen*, 35 F.3d 1027, 1038 (citing 20 C.F.R. § 404.1529); *see also* SSR 96-7p, 1996 WL 374186.

Here, the ALJ reviewed the relevant medical evidence of musculoskeletal pain along with the results of objective medical evidence, such as radiology tests, physical examinations by physicians, and treatment history.  (R. 7, PageID #: 60-61.)  Marks's treating physician indicated that "claimant was well appearing and not in any distress[,]" which the ALJ noted occurred despite plaintiff's alleged chronic pain.  *Id.*, citing PageID #: 817, 840.  The ALJ identified records that, for example, Marks maintained normal range of motion in her neck.  *Id.*, citing PageID #: 818-819, 860.  The medical evidence showed Marks "maintained normal muscle tone as well as strength and was without any atrophy, tremor, or cranial nerve or sensory deficits," and she maintained a normal gait and coordination.  *Id.*, citing PageID #: 821.  Such findings, the ALJ reasonably determined, undermine the alleged severity of Marks's symptoms.

Further supporting the ALJ's findings, the decision noted the treatment plans —
recommended by Dr. Scullin, Dr. Yonan and Dr. Tsai — for decreasing Marks's symptoms.  (R.
7, PageID #: 61, citing PageID #: 824, 890, 918, 940-941.)  In May 2013, Dr. Scullin
recommended a home exercise program, reviewed stretching and relaxation techniques, which
Marks was to do twice a day, and advised Marks to exercise three times per week, for thirty
minutes at a time.  (R. 7, PageID #: 606, *see also* 824.)[9]  In January 2014, Dr. Tsai recommended
that Marks exercise for thirty minutes, three times a week, suggesting "weight-bearing aerobic
exercises such as walking, dancing, low impact aerobics, elliptical machine, stair climbing,
gardening, flexibility exercises and strength training exercises."  (R. 7, PageID #: 940, *see also*
935, 941-942.)  In June 2015, Dr. Yonan recommended that Marks "undergo stretching,
strengthening, and resistance exercises for the back and abdominal muscles."  *Id.* at PageID #:
915, 918; *see also* 890 (same).  In addition, a home exercise program including "walking for 30
minutes twice daily followed by walking stairs for 10 minutes" was recommended.  *Id.* at
PageID #: 918.

The ALJ also reviewed Marks's hearing testimony that she went camping, sleeping in an
outdoor tent, and went canoeing.  (R. 7, PageID #: 61.)  Marks also reported that she regularly
attended a local flea market, and that she was able to drive several times a week, "which [the
ALJ concluded] indicated an ability to sit, stand, walk and perform multiple simultaneous
movements with her upper and lower extremities."  *Id.*  The ALJ concluded that, "based on the
foregoing recommended exertion and actual physical exertion on the part of the claimant, the
undersigned finds the claimant's alleged pain symptoms were not as disabling as alleged."  *Id.*

---

[9] Dr. Scullin also recommended the same exercise plan in December 2013.  (R. 7, PageID
#: 650),

The ALJ's findings based on the credibility of the claimant are accorded great deference. *Walters*, 127 F.3d at 531; *Gonzalez*, 2008 WL 584927, at *5.  The ALJ identified specific facts supported by the record which cast doubt on the severity of the disabilities as alleged by Marks. The court finds that the ALJ's contested credibility determinations are reasonable, specific, and supported by substantial evidence.  Because "a reasonable mind might accept [the evidence] as adequate to support" the credibility determination, the court concludes that substantial evidence supports the ALJ's finding.  *Norris v. Commissioner*, No. 11-5424, 2012 WL 372986, at *5 (6th Cir. Feb. 7, 2012) (citing *Rogers*, 486 F.3d at 241).

## VIII. CONCLUSION

For the foregoing reasons, the court finds that the decision of the Commissioner is supported by substantial evidence.  The decision of the ALJ should be affirmed.

Date:  <u>January 12, 2018</u>                              s/ *David A. Ruiz*
                                                            David A. Ruiz
                                                            United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).